STATE of Utah, Plaintiff and Appellant,

v.

Tereso GODINA–LUNA and Geronimo R. Orozco, Defendants and Appellees.

No. 900567–CA.

Court of Appeals of Utah.

Jan. 30, 1992.

R. Paul Van Dam, Atty. Gen., David B. Thompson, Asst. Atty. Gen., Salt Lake City, for plaintiff and appellant.

Solomon J. Chacon, Salt Lake City, for defendants and appellees.

Before BILLINGS, GARFF and RUSSON, JJ.

## OPINION

GARFF, Judge:

The State of Utah appeals an order granting defendants' motion to suppress evidence seized from their vehicle after a deputy sheriff stopped them for a traffic violation. The trial court held the initial stop was valid, but the detention and search of the vehicle exceeded the scope of the stop and was therefore illegal. We affirm.

## FACTS

■ The constitutionality of a police officer's detention and search of an individual's automobile turns on the facts specific to each case. *State v. Jackson*, 805 P.2d 765, 766 (Utah App.1990), *cert. denied*, 815 P.2d 241 (Utah 1991). We therefore set out the facts in detail, drawing from the trial court's findings of fact and the record from the suppression hearing.

On March 8, 1990, a Sevier County deputy sheriff was patrolling Interstate 70. While proceeding west, he observed defendants' vehicle in the eastbound lane. He clocked its speed at fifty-two miles per hour, which was within the speed limit.

Shortly thereafter, the deputy changed direction and proceeded eastbound. Catching up with the vehicle, he observed it drift into the emergency lane and then back into the proper lane of traffic. He noted the car's occupants were Hispanic. He ran a license check on the car to determine its owner and whether it had been reported stolen. He was notified the vehicle was registered to a Salt Lake resident and had not been reported stolen.

While pulling away from the vehicle, the deputy observed it drift again into the emergency lane. Suspecting the driver might be intoxicated, he signaled for the vehicle to pull over.

The deputy testified that, after stopping the vehicle, he immediately concluded the two occupants, defendants Orozco and Luna, were sober. He based his conclusion on the fact that he could smell no alcohol, and that neither occupant appeared to have been drinking.

The deputy testified that, when he requested Orozco, the driver, to produce his driver's license and vehicle registration, Orozco shook "just like someone that just wants to please just like I did when my mom was after me when I got in the cookies when I was eight years old." The deputy conceded that he noticed most people "shake at first" after being pulled over for a traffic violation.

Orozco produced a California identification card and the registration, both of which confirmed the information the deputy received over the radio. Orozco did not have a driver's license. Neither he nor Luna were the registered owner of the car, nor did they claim to be. Luna, in response to the deputy's request, produced his driver's license and the deputy took it. Orozco correctly identified the owner of the car, explaining that the owner had loaned it to them so they could go to Chicago. The deputy noted that I–70 is not the most direct route to Chicago from Salt Lake City.

The deputy then returned to his car with defendants' papers. He ran a check of these items and found nothing amiss. He also radioed in a request for a back-up officer to help him search defendants' car. He did not issue a citation.

The deputy, still retaining defendants' papers, asked them if they had any alcohol, firearms, or drugs in the vehicle. The deputy testified that it was Orozco's nervous behavior that prompted him to pose this question. Orozco, believing that the fact he was Mexican and did not have a driver's license meant the deputy was going to search his car "whether we let him or not," responded "No, if you'd like to check, go ahead." The deputy then searched the vehicle with the aid of another deputy sheriff who had arrived on the scene. The search revealed four kilograms of cocaine in the trunk of the vehicle.

Defendants moved to suppress the evidence, arguing that the search violated their Fourth Amendment rights. Defendants argued that the initial stop was pretextual and therefore illegal, and that Orozco's consent to the search was the product of the deputy's exploitation of that illegality.

At the suppression hearing, the trial court held the initial stop was valid "if the officer had legitimate concerns as to possible intoxication of the driver." However,

"the officer exceeded his authority when, based on the Defendants['] race and being in an out of state vehicle [sic], he continued to interrogate and restrict the freedom of the Defendants. It obviously became a profile stop when the officer questioned about drugs and weapons."

The State appeals. The issues raised on appeal are the following:[1] (1) whether the deputy had the requisite reasonable suspicion to further detain and question defendants concerning alcohol, firearms, and drugs; (2) assuming defendants were illegally detained, whether Orozco's invitation to search was voluntary, and (3) whether the consent was sufficiently attenuated from the illegal police conduct so as to purge the illegality and render the search valid.

■ In reviewing a trial court's decision to grant or deny a motion to suppress, findings of fact will not be disturbed unless they are clearly erroneous. *State v. Steward*, 806 P.2d 213, 215 (Utah App.1991); Utah R.Civ.P. 52(a) (1990). However, in reviewing the court's conclusions of law, we apply a correction of error standard. *Steward*, 806 P.2d at 215.

## SEIZURE

■ Once a Fourth Amendment seizure has occurred, any detention for reasons exceeding the scope of the original stop and not reasonably related to the circumstances justifying the stop in the first place, is illegal. *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1878–79, 20 L.Ed.2d 889 (1968); *State v. Robinson*, 797 P.2d 431, 437–38 (Utah App.1990).

■ In other words, "[t]he length and scope of the detention must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *State v. Johnson*, 805 P.2d 761, 763 (Utah 1991); (quoting *Terry*, 392 U.S. at 19–20, 88 S.Ct. at 1879). Once the reasons for the initial stop have been satisfied, the individ-

---

**1.** The State, as appellant, does not challenge the trial court's conclusion that the stop was not pretextual. Although defendants did preserve the issue below, and did argue it in their brief in

the context of alternative grounds on which we could affirm, we decline to address the issue because we resolve the case on other grounds.

ual must be allowed to proceed on his or her way. "Any further temporary detention for investigative questioning after the fulfillment of the purpose for the initial traffic stop is justified under the fourth amendment only if the detaining officer has a reasonable suspicion of serious criminal activity." *Robinson,* 797 P.2d at 435 (citing *United States v. Guzman,* 864 F.2d 1512, 1519 (10th Cir.1988)).

■ The trial court's findings of fact, and the record from the suppression hearing, indicate defendants were not free to leave because the deputy continued to hold their papers after he had satisfied himself that they were not intoxicated. Further, the deputy admitted at the suppression hearing that defendants were not free to leave at any time during the stop. Therefore, in view of all of the circumstances, defendants were seized under the Fourth Amendment. *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *State v. Jackson,* 805 P.2d 765, 767 (Utah App.1990).

■ We therefore must consider whether the deputy had a reasonable articulable suspicion of criminal activity justifying further detention of defendants. *Robinson,* 797 P.2d at 435. We find no facts supporting a reasonable suspicion of criminal activity. The fact that defendants were nervous does not raise a reasonable suspicion of criminal activity, *id.* at 436, nor does the fact that they were proceeding in a less than direct route to their destination.

■ Although the deputy's hunch ultimately proved to be correct, a hunch, without more, does not raise a reasonable articulable suspicion regardless of the final result. *Johnson,* 805 P.2d at 764 (citing *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883).[2]

2. We note, with concern, that the record does not reveal how many unsuccessful searches [this officer] has conducted or how many innocent travelers [he] has detained. Common sense suggests that those numbers may be significant. As well as protecting alleged criminals who are wrongfully stopped or searched, the Fourth Amendment of the Constitution protects these innocent citizens as well.

In short, the record reveals nothing raising a reasonable suspicion justifying further detention. We therefore conclude the deputy's detention and questioning of defendants exceeded the scope of the stop and was therefore illegal.

### CONSENT

■ We next consider the issue of whether Orozco's invitation to search was lawfully obtained following the officer's illegal seizure. The State must show the consent was (1) voluntary, and (2) not obtained by exploitation of the prior illegality. *State v. Arroyo,* 796 P.2d 684, 688 (Utah 1990). "Evidence obtained in searches following police illegality must meet both tests to be admissible." *Id.* (citing 3 W. LaFave, *Search and Seizure* § 8.2(d), at 190 (2d ed. 1987)).

■ We first examine whether the evidence was obtained by exploitation of the prior illegality, in other words, whether the consent was sufficiently attenuated from the illegal seizure. The factors to be considered in an exploitation analysis include temporal proximity of the illegality and the consent, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *Id.* at 690–91 n. 4 (citing *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975)).

■ Therefore, we consider "whether ... the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (quoting Maguire, *Evidence of Guilt* 221 (1959)). This requires that the State "establish the existence of

*United States v. Miller,* 821 F.2d 546, 550 (11th Cir.1987). In short, we cannot condone unconstitutional police conduct simply because it yields favorable results. *See also Arizona v. Hicks,* 480 U.S. 321, 329, 107 S.Ct. 1149, 1155, 94 L.Ed.2d 347 (1987) ("there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all.").

**656**

intervening factors which prove that the consent was sufficiently attenuated from the illegal stop." *Arroyo,* 796 P.2d at 691 (quoting *United States v. Melendez–Gonzalez,* 727 F.2d 407, 414 (5th Cir.1984)).

■ Here, such intervening factors simply do not exist. The consent occurred during an ongoing illegal seizure, thus no time factor separated the illegality from the consent. Nor were there any intervening circumstances separating the illegality from the consent. Orozco's invitation to search was not of itself an intervening circumstance because the invitation came in response to a question posed in the midst of an ongoing illegal seizure. The deputy's question which prompted Orozco's invitation confirmed defendant's belief that because he was Mexican and did not have a driver's license, a search would be inevitable whether he consented or not. Therefore, we conclude that Orozco's invitation to search was the result of the exploitation of his illegal detention.

Because the State failed to prevail on the exploitation analysis, we need not consider whether the consent itself was voluntary. *Arroyo,* 796 P.2d at 688. We therefore affirm the court order suppressing the evidence.

Affirmed.

BILLINGS and RUSSON, JJ., concur.